**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ACCRETIVE HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ADAM S. CARTABIANO | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT FOR**
**INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Accretive Health, Inc.'s ("Accretive"), Verified Complaint For Injunctive And Other Relief against Defendant Adam S. Cartabiano ("Cartabiano") is as follows:

**NATURE OF ACTION**

1.      This is an action for breach of contract, breach of fiduciary duty and misappropriation of trade secrets in violation of Illinois' Trade Secrets Act, 765 ILCS § 1065, et seq. ("ITSA").  To redress these grievances, Accretive seeks preliminary and permanent injunctive relief and damages.

2.      Accretive brings this action to prevent irreparable harm to its business caused by, among other things, Cartabiano's dissemination of Accretive's proprietary business information to, among others, MedeAnalytics, Inc. ("MedeAnalytics").  MedeAnalytics is a direct competitor of Accretive who recently hired Cartabiano.

3.      During his employment with Accretive, Cartabiano received access to and learned about Accretive's trade secrets and other confidential business information.  In exchange, Cartabiano agreed, among other things, that he would not: (a) disclose or use Accretive's

12324703v.7

confidential and proprietary information for an improper purpose; (b) accept employment with a competitor for a period of twelve (12) months following termination of employment with Accretive; and (c) solicit or induce any customer or former employees of Accretive for a period of at least two years.

4.     Cartabiano has breached his contractual obligations owed to Accretive by, among other things, accepting employment with MedeAnalytics and, using and disclosing Accretive's trade secrets and other confidential business information for his own personal benefit.

5.     Cartabiano has also breached his fiduciary obligations owed to Accretive by creating competing business plan documents using Accretive's resources and while employed by Accretive, usurping, or attempting to usurp, corporate opportunities from Accretive, and misusing Accretive's confidential information.

6.     Accretive now seeks damages and injunctive relief to enjoin the threatened and/or actual misappropriation and misuse of Accretive's confidential and proprietary information, as well as the irreparable injury Cartabiano will cause through his violation of post-employment contractual obligations to Accretive and his unfair competition with Accretive.

## PARTIES

7.     Accretive is a Delaware corporation with its principal place of business located at 401 N. Michigan Avenue, Suite 2700, Chicago, Illinois 60611.

8.     Cartabiano is an individual domiciled and residing at 2710 Lancaster Road, Bloomfield Hills, MI 48302.

12324703v.7

## JURISDICTION AND VENUE

9.      This Court has jurisdiction by reason of diversity of citizenship under 28 U.S.C. § 1332 because the parties are completely diverse and because the amount in controversy exceeds $75,000.

10.      This Court has personal jurisdiction over Cartabiano and venue is proper in this District under 28 U.S.C. § 1391(a) because Cartabiano entered into an employment contract in this district with an employer, Accretive, who has its principle place of business in this district. Cartabiano also committed tortious acts in this district. Further, a substantial part of the events or omissions giving rise to Accretive's claims occurred in this district.

## BACKGROUND

### Accretive and Its Business

11.      Accretive provides Revenue Cycle Management services and solutions to healthcare providers located across the United States.

### A.      The Healthcare Revenue Cycle

12.      The complex series of recurring events that healthcare providers must accurately complete to generate revenues for the healthcare services they provide is known as the "Revenue Cycle". The series of events which make up the Revenue Cycle encompass the entire patient healthcare experience, including pre-registration, scheduling and admission, medical record coding, billing, quality assurance, contractual compliance, patient financial services, and collections.

13.      The annual costs that healthcare providers spend on completing the administrative tasks associated with the Revenue Cycle, such as checking patient eligibility, collecting co-pays, charge coding, bill preparation, data entry, claims submission, payment posting and managing

12324703v.7

accounts receivables, is significant in relation to its overall revenues and can seriously affect a healthcare provider's overall financial viability..

14.     As a result it is critical for a healthcare provider to streamline its Revenue Cycle by eliminating waste, reducing administrative costs and completing Revenue Cycle tasks in a timely and accurate manner.

      **B.     Revenue Cycle Management**

15.     The process of maximizing the revenues that a healthcare provider receives from providing healthcare services is known as Revenue Cycle Management ("RCM").

16.     Over the past 10 years, an increasing number of healthcare providers across the country have been implementing new technologies and outsourcing services in an effort to improve their Revenue Cycles.  This has created a highly competitive Revenue Cycle Management Industry, which comprises hundreds of Revenue Cycle vendors that offer a wide range of business models and service offerings.  While some of these vendors offer only limited services such as billing submission or selling and maintaining patient management software, others, such as Accretive, offer much broader services such as total RCM.

      **C.     Accretive's Business**

17.     Founded in 2003, Accretive has become an industry leader in the RCM industry. It has done so by developing and using methods, which allow it to deliver the highest level of service and value to healthcare providers, including single hospitals and entire healthcare systems.

18.     Accretive offers end-to-end, technology-underpinned RCM services and solutions.  Essentially, Accretive contracts with its customers to assume complete management of the customer's Revenue Cycle.  Accretive then helps its customers improve their Revenue

4

12324703v.7

Cycles by leveraging, among other things, Accretive's proprietary and confidential methods, technology and information.

19.     In particular, the heart of Accretive's RCM services and offerings is a complex, highly confidential and proprietary set of methods and software tools, as well as revenue cycle information Accretive has assembled over many years, including benchmark cost data and hospital operating cost statistics ("Confidential RCM Information").  Accretive's Confidential RCM Information includes, by way of example: (a) the operating costs hospitals incur in collecting outstanding balances; (b) fee structures and terms Accretive has negotiated with third party vendors, such as collection agencies, transcription companies and contract coding companies; and (c) productivity metrics and target staffing levels and expenses for hospitals.

20.     Accretive uses and relies upon its Confidential RCM Information to analyze its customers' entire Revenue Cycles and identify areas and opportunities for improvement.  Based on its analysis of  its customers' Revenue Cycles using its Confidential RCM Information, Accretive negotiates rates with third party vendors and with customers for the RCM services it provides.  Accretive also uses its Confidential RCM Information to improve the revenue cycle operations of its customers and to monitor and benchmark the benefits it provides to its customers.

21.     Accretive would suffer irreparable harm if its Confidential RCM Information fell into the hands of a competitor.  Armed with such information a competitor could, for example, greatly improve its bargaining power in negotiating fee structures and terms on behalf of its customers, thereby significantly improving that competitor's value in the marketplace.

5

12324703v.7

22. Accretive maintains its Confidential RCM Information and technologies within its internal, password protected server, accessible only by the leadership of Accretive, starting at the manager level.

23. Accretive has developed and maintains its Confidential RCM Information at great expense.

24. Through the use of its Confidential RCM Information, Accretive provides significantly strengthened financial results to its customers.

**D.      Accretive's Customer Relationships**

25. Accretive maintains strong relationships with its customers and has a reasonable expectation that such relationships will continue on a going forward basis. Indeed, because of the manner in which Accretive provides its services, Accretive healthcare providers enter into multi-year contracts with Accretive and continue to use Accretive for their revenue cycle needs.

26. Accretive's customer relationships are of paramount significance to its business reputation and success.

27. In order to maintain its relationships and develop new relationships, Accretive expends hundreds of thousands of dollars each year on training and educating its managers and directors.

28. On an on-going basis Accretive professional staff from around the country travel to Chicago, Illinois to meet and discuss best practices learned in the field to continue the training and improvement of the services provided by the Accretive managers.

**Accretive Protects Its Confidential and Proprietary Information**

29. Accretive requires that its proprietary customer and business information, including its Confidential RCM Information, be kept strictly confidential by its employees and

6

12324703v.7

restricts access to this information. Accretive takes specific measures to preserve the

confidentiality of this information, including, but not limited to, the following:

a.  Accretive restricts access to its computerized information, (including its "tools"), its internal computer network, and computers through the use of passwords;

b.  Accretive has several different extranet servers, each requires a unique "rich mix" password which must be changed frequently to ensure the security of the data;

c.  Accretive requires its site leaders to review the user lists regarding these sites to ensure it is limited only to those who absolutely need access;

d.  Access to each particular customer is limited to only those individuals servicing that customer, and others may only gain access through a special request to Accretive management;

e.  Accretive limits the use of its property, materials or facilities to activities related to Accretive's business and prohibits the removal of Accretive's property without permission;

f.  Accretive restricts access to its offices by, for example, requiring a key for after hours access;

g.  Accretive requires its key employees to sign a "Confidentiality and Non-Disclosure Agreement" which prohibits employees from using or improperly disclosing any confidential, proprietary and/or trade secret information belonging to Accretive, and restrict employees' competitive post-employment activities; and

h.  Upon an employee's separation from Accretive, any passwords that he or he may have been given to access the above programs are immediately disabled to prevent any further access by that employee. In addition, the employee is required to return to Accretive any of Accretive's property, including any confidential and proprietary information, computers, Blackberry devices and other electronic equipment.

30.  Accretive rigorously maintains the confidentiality of its proprietary customer and

business information, including its Confidential RCM Information, because the information

provides Accretive with a competitive advantage in the marketplace from which Accretive

derives economic value.

12324703v.7

31.     Accretive has spent several million dollars and many years developing and marketing its revenue cycle services and developing and maintaining its proprietary customer and business information, including its Confidential RCM Information, computer programs and related databases. Accretive's knowledge and information of its proprietary customer and business information, including its Confidential RCM Information, computer programs and related databases, sets it apart from its competitors.

**Cartabiano's Employment with and Contractual Obligations Owing to Accretive**

32.     Cartabiano began working for Accretive as a Senior Financial Site Lead in April 2006. As a Senior Financial Site Lead, Cartabiano developed detailed revenue and cost budgets in concert with executive level hospital administrators; developed and implemented cost reduction strategies and productivities measures.

33.     In April, 2008, Cartabiano was promoted to Senior Analyst of Corporate Cost Management and eventually worked his way up to the position of Manager of Corporate Cost Management.

34.     As Senior Analyst and then Manager of Corporate Cost Management, Cartabiano worked directly with Accretive's management team to develop strategies for reducing customers' costs and setting cost plan strategies. In addition, Cartabiano worked directly with Rich Gillette, one of Accretive's senior vice presidents in developing and using the Confidential RCM Information. In working with Mr. Gillette, Cartabiano was one of only four people on a team responsible for developing Accretive's confidential and proprietary benchmark cost data and using such data in developing and implementing Accretive's hospital cost management strategy.

8

12324703v.7

35.     In order to perform his duties for Acrretive, Cartabiano was permitted to work with and further develop Accretive's relationships with its customers.  Cartabiano was also permitted to access and learn about Accretive's proprietary customer and business information, including Accretive's operating procedures, tools, technology and  innovations as well as its Confidential RCM Information, computer programs and related databases.

36.     Cartabiano would not have known or had access to, the Confidential RCM Information but for working at Accretive and executing agreements with covenants directed at maintaining the confidentiality of such information, as well as its customer relationships.

37.     As a condition of, and as consideration for, his employment with Accretive -- and in order to protect Cartabiano's and Accretive's interests in the employment relationship, the protection of Confidential RCM Information and customer relationships -- Cartabiano executed a Confidentiality and Non-Disclosure Agreement ("NDA"), a copy of which is attached hereto as Exhibit A.

38.     The NDA prohibits Cartabiano from disclosing any Accretive confidential information or using any such information for his own benefit. (Ex. A at ¶ 2).

39.     By executing the NDA, Cartabiano acknowledged his understanding that he would be provided Accretive's confidential and proprietary business information and that he would be introduced to Accretive's long-standing customers.  Cartabiano understood the obligations contained in the NDA, including the post-employment activity restrictions, and signed the Agreement voluntarily after being given sufficient time to review it.  (Ex. A at p. 3).

40.     The NDA also contains a non-competition provisions, which provides as follows::

Competition.  During the Term and for a period of twelve (12) months thereafter, regardless of the reason for termination of employment, the Executive will not directly or indirectly (as a director, officer, executive employee, manager,

9

consultant, independent contractor, advisor or otherwise) engage in competition with, or own any interest in, perform any services for, participate in or be connected with any business or organization which is competitive to the Business of the Company anywhere in the United States of America. The term "Business of the Company" shall mean any business with an activity that is competitive with that engaged in by the Company, including the delivery of revenue cycle services and solutions, at the time at issue.

(Ex. A at ¶ 4).

41.     In addition to executing the NDA, on April 28, 2006, Cartabiano also executed an "Acknowledgement of Grant Under Healthcare Services, Inc. Stock Option Plan" and received the right to acquire shares of Series C Common Stock of Accretive Health, Inc. (the "Option Grants"). (Ex. B at ¶ a).

42.     The Option Grants were expressly made "subject to the terms and conditions of" Accretive's Amended and Restated Stock Option Plan and amendments thereto ("Stock Option Plan"), a copy of which is attached as Exhibit C. In other words, by accepting the Option Grants, Cartabiano became "bound by all of the terms and provisions contained in the Plan[.]" (Exs. B & C).

43.     Article X of the Stock Option Plan, as amended, contains certain restrictive covenants. Specifically, Section 10.6 provides that:

During the time in which Participant performs services for the Company and for a period of twelve (12) months after the cessation of Participant's service with the Company, regardless of the reason, Participant shall not, directly or indirectly, either alone or in conjunction with any person, firm, association, company or corporation, within the Restricted Area, own, manage, operate, or participate in the ownership, management, operation, or control of, or be employed by or provide services to, any entity which is in competition with the Company.

(Ex. C at ¶ 10.6 at p. A-3).

44.     By accepting the Option Grants, Cartabiano acknowledged his understanding that he would be bound by the terms and conditions of the Stock Option Plan. Cartabiano understood

10

the obligations contained in the Stock Option Plan, including the post-employment activity restrictions, and accepted the Option Grants voluntarily after being given sufficient time to review both the Option Grants and the Stock Option Plan.

**Cartabiano Resigns from Accretive**

45.     On or around April 29, 2010, Cartabiano advised Accretive he planned to terminate his employment within two weeks.

46.     Several days later Accretive learned Cartabiano planned to work for MedeAnalytics, one of Accretive's direct competitors.  Shortly thereafter, Accretive held a meeting with Cartabiano, at which time Accretive provided him copies of the NDA.  During this meeting Accretive advised him that Accretive expected him to honor his contractual obligations.

**Accretive Discovers That Cartabiano Breached his Confidentiality and Fiduciary Obligations Owed to Accretive**

47.     After his resignation, Accretive reviewed the Accretive computer that was assigned to Cartabiano.  That review revealed several troubling facts concerning Cartabiano's conduct prior to leaving Accretive.

48.     First, Accretive discovered that on or around August 2009, Cartabiano -- for his own benefit and unbeknownst to Accretive – created on his Accretive-issued computer, a Power Point presentation of a personal business plan that incorporates and reveals some of Accretive's highly confidential benchmark data and other revenue cycle and billing model statistics Accretive generated through years of effort.  Cartabiano then proceeded to email that presentation from his work account to his personal email account, an account Accretive does not control, to ensure this information could be available for his personal benefit.

49.     Second, Accretive discovered that after receiving an offer of employment from MedeAnalytics but before announcing his resignation, Cartabiano created a zipped folder (used to make larger volumes of information portable) containing Accretive confidential information, which he proceeded to transmit to his personal email account.

50.     These documents include a draft of a resume Cartabiano created which, like his business plan, incorporates and discloses some of Accretive's highly confidential benchmark data and other statistics.  Cartabiano presumably transmitted copies of his resume to potential employers, and, therefore, disclosed Accretive's confidential information to third-parties, including Accretive's competitors, such as MedeAnalytics.

51.     The documents that Cartabiano e-mailed to his personal e-mail account also included a draft letter to Ken Kubisty, a Vice-President and Chief Revenue Officer at Methodist Hospitals, a potential customer of Accretive.   In this letter, Cartabiano informs Mr. Kubisty that Cartabiano intends to pursue an independent consulting path, separate from Accretive Health, that is primarily focused on revenue cycle, non payroll cost reduction work and solicits the sale of those services from Methodist Hospitals

52.     As an Accretive employee, part of Cartabiano's duties also included performing revenue cycle, non payroll cost reduction work for Accretive's customers.  Indeed, in his letter to Mr. Kubisty, Cartabiano specifically states that he performed similar work for Accretive and then discloses some of Accretive's confidential benchmark data concerning that work.

53.     In addition, among the documents Cartabiano e-mailed to himself, was a letter from MedeAnalytics, dated March 29, 2010 offering Cartabiano employment with MedeAnalytics as a Senior Consultant, Performance Management Consulting.

12

12324703v.7

54.     Like Accretive, MedeAnalytics provides hospitals and health systems with solutions for revenue cycle management and competes directly with Accretive in the marketplace.

## COUNT I

### BREACH OF CONTRACT

55.     Accretive hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 54.

56.     Cartabiano's agreements with Accretive, including the NDA and Stock Option Plan, are valid and enforceable contracts.  The confidentiality covenants and post-employment activity covenants contained in those agreements are reasonable in scope and duration, and are reasonably necessary to protect Accretive's legitimate protectable interests in its confidential and proprietary business information and in preventing unfair competition.

57.     Accretive has fully performed all of its obligations under these agreements.

58.     By his actions, Cartabiano breached, is breaching, and is threatening to continue to breach certain post-employment contractual obligations contained in his agreements in at least one of the following ways:

a..     Accepting employment and becoming employed by MedeAnalytics, a direct competitor of Accretive, in violation of the restrictive covenant provisions contained in his NDA and Stock Option Plan; and

b.      Using for his own benefit or for the benefit of others, and/or disclosing to others, confidential information of Accretive, including, without limitation, Accretive's Confidential RCM Information.

c.      Failing to return and/or improperly retaining Accretive's confidential and proprietary business information.

13

59.     As a result of Cartabiano's breaches of contract, Accretive has been injured and faces irreparable injury.  Accretive is threatened with a loss of value of its confidential and proprietary information, as well as a loss of goodwill, for which a remedy at law is inadequate, and thus Cartabiano must be enjoined and restrained by order of this Court.

## COUNT II

## BREACH OF FIDUCIARY DUTY

60.     Accretive realleges and incorporates herein by reference Paragraphs 1 through 59.

61.     As Manager of Corporate Cost Management, Cartabiano owed Accretive duties of fidelity and loyalty.  Those fiduciary duties required Cartabiano to (a) act in the best interest of Accretive, (b) not act in any way to the detriment of Accretive, and (c) not allow his personal interests to take priority over the interests of Accretive.

62.     While employed by Accretive, Cartabiano breached his fiduciary duties owed to Accretive by, among other things:

a.      Usurping or attempting to usurp corporate opportunities from Accretive; and

b.      Misusing Accretive's confidential information; and

c.      Creating competing business plan documents using Accretive's resources.

63.     During the period that Cartabiano breached his fiduciary duties, Accretive paid Cartabiano compensation and other benefits which would be inequitable for Cartabiano to retain.

64.     Cartabiano intentionally breached his fiduciary duties owed to Accretive, with the knowledge that his conduct would cause injury to Accretive and would benefit himself.  As such, Cartabiano acted with malice toward Accretive.

65.     Cartabiano's breach of his fiduciary duties owed to Accretive has damaged Accretive.

12324703v.7

## COUNT III

### THREATENED OR ACTUAL MISAPPROPRIATION OF TRADE SECRETS (ILLINOIS' TRADE SECRETS ACT, 765 ILCS § 1065, ET SEQ.)

66.     Accretive hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 65.

67.     The confidential and proprietary information entrusted to Cartabiano by Accretive constitutes trade secrets because Accretive derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and because the information is the subject of reasonable efforts to maintain its secrecy.

68.     Cartabiano has threatened to misappropriate and/or has misappropriated, Accretive's trade secrets and confidential information without Accretive's consent in violation of Illinois' Trade Secrets Act, 765 ILCS § 1065, et seq.

69.     Cartabiano has been and/or will be unjustly enriched by his misappropriation of Accretive's trade secrets and/or confidential and proprietary information, and, unless restrained, will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate Accretive's trade secrets and confidential information.

70.     On information and belief, Cartabiano's actions have been willful and malicious.

71.     As a result of Cartabiano's misappropriation of Accretive's trade secrets, Accretive has been injured and faces irreparable injury.  Accretive is threatened with a loss of value of its confidential and proprietary information, as well as a loss of goodwill, for which a remedy at law is inadequate, and thus Cartabiano must be enjoined and restrained by order of this Court.

12324703v.7

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, ACCRETIVE HEALTH, INC. prays for the following relief:

a. That Cartabiano be preliminarily and permanently enjoined for 12 months from working for MedeAnalytics;

b. That Cartabiano be preliminarily and permanently enjoined from utilizing or disclosing Accretive's trade secrets and other confidential business information;

c. That Cartabiano be ordered to return any and all of Accretive's trade secrets and other confidential business information in his possession, custody or control;

d. That Cartabiano identify all third parties to whom he revealed Accretive's trade secrets and other confidential business information;

e. That Accretive be awarded compensatory damages in an amount to be proven at trial in excess of $75,000;

f. That Cartabiano disgorge any monies he received from Accretive during the time that he was violating his fiduciary obligations;

g. That Accretive be awarded punitive and/or exemplary damages for willful and malicious conduct;

h. That Accretive be awarded attorneys' fees and the costs of this action as permitted by law; and

i. That Accretive be awarded such other and further relief as the Court deems just and equitable.

12324703v.7

**Dated: May 20, 2010**     Respectfully submitted,

ACCRETIVE HEALTH, INC.

By: s/ Daniel F. Lanciloti
    One of Its Attorneys

Daniel Lanciloti
Jason P. Stiehl
Matthew A. Werber
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000 (telephone)
(312) 460-7000 (facsimile)

*Attorneys for Accretive Health, Inc.*

17

12324703v.7

## <u>Verification</u>

Gregory N. Kazarian states as follows:

1.  I am the _SENIOR VICE PRESIDENT_ of Accretive Health, Inc.

2.  I have full knowledge of and am competent to testify to all matters stated herein.

3.  I have read Accretive Health, Inc.'s Verified Complaint for Injunctive and Other

Relief and the factual allegations contained therein are true and correct to the best of my

knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of May, 2010.


Gregory N. Kazarian